IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
5:15-CV-317-D

| | | |
|---|---|---|
| CUMERLAND COUNTY HOSPITAL SYSTEM, INC. d/b/a CAPE FEAR VALLEY HEALTH SYSTEM, | ) ) ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **MEMORANDUM** |
| | ) | **AND RECOMMENDATION** |
| THOMAS E. PRICE,[1] Secretary of the United States Department of Health and Human Services, | ) ) ) | |
| | ) | |
| Defendant. | ) | |

In this action, plaintiff Cumberland County Hospital System, Inc. d/b/a Cape Fear Valley Health System ("plaintiff" or "CFVHS") challenges the final decision of defendant Secretary of the United States Department of Health and Human Services ("HHS") Thomas E. Price ("the Secretary") concerning plaintiff's application for Medicare reimbursement for services it provided to a patient identified herein as S.T.[2] (or in context, "the beneficiary"). The case is before the court on the parties' motions for judgment on the pleadings. D.E. 53, 55. The motions were referred to the undersigned magistrate judge for a memorandum and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). *See* D.E. 62. For the reasons set forth below, it will be recommended that plaintiff's motion be allowed, the Secretary's motion be denied, the Secretary's final decision denying plaintiff's application be reversed, and this case be remanded for reimbursement of plaintiff by the Secretary.

---

[1] Thomas E. Price has succeeded the former defendant, Sylvia Matthews Burwell, as Secretary of the United States Department of Health and Human Services, and has been substituted for her as the defendant in this case pursuant to Fed. R. Civ. P. 25(d) ("An action does not abate when a public officer who is a party in an official capacity . . . ceases to hold office while the action is pending. The officer's successor is automatically substituted as a party.").

[2] To protect the patient's privacy, she is referred to solely by her initials throughout this Memorandum and Recommendation.

# BACKGROUND

## I. STANDARDS FOR MEDICARE APPEALS PROCESS

"Medicare is a federal program providing subsidized health insurance for the aged and disabled [and] [t]he Secretary of Health and Human Services . . . is charged by Congress with administering the Medicare statute." *Almy v. Sebelius*, 679 F.3d 297, 299 (4th Cir. 2012). The part of the program at issue in this case, Part A, covers insurance benefits for inpatient hospital and other institutional care. *See* 42 U.S.C. §§ 1395c–1395i–4. In general, no payment may be made under Medicare Part A unless the services provided were reasonable and necessary. 42 U.S.C. § 1395y(a)(1)(A).

In *Cumberland Cty. Hosp. Sys., Inc. v. Burwell*, 816 F.3d 48 (4th Cir. 2016),[3] the Fourth Circuit outlined the Medicare appeals process:

> To obtain reimbursement for Medicare services, a healthcare provider must, in the first instance, submit a claim to a Medicare Administrative Contractor, a private contractor retained by HHS to make an initial determination regarding whether and in what amount the claim should be paid. *See* 42 U.S.C. §§ 1395ff(a), 1395kk–1(a). That determination by the Medicare Administrative Contractor may, under a program that Congress established in 2010, be audited by a different third-party government contractor, known as a Recovery Audit Contractor. *See id.* § 1395ddd(h)(3). Congress created that audit program to serve "the purpose of . . . recouping overpayments," and it incentivized the Recovery Audit Contractors by paying them "on a contingent basis for collecting overpayments." *Id.* § 1395ddd(h)(1). Healthcare providers wishing to challenge these initial claim determinations by the Medicare Administrative Contractor or the Recovery Audit Contractor must pursue a comprehensive, four-step administrative review process before seeking review in court.
>
> At the *first* step, a healthcare provider dissatisfied with either the initial determination or the results of an audit may seek a redetermination from the original Medicare Administrative Contractor. *See* 42 U.S.C. § 1395ff(a)(3). At the *second step*, if the healthcare provider is dissatisfied with the redetermination,

---

[3] In that case, plaintiff sought a declaratory judgment and writ of mandamus compelling the Secretary to resolve plaintiff's numerous pending administrative appeals. While the Fourth Circuit acknowledged that "the delay in the administrative process for Medicare reimbursement is incontrovertibly grotesque," it affirmed the district court's holding that the issuance of mandamus was not appropriate and that the political branches were better suited to address the delay. 816 F.3d at 50.

it may seek reconsideration by a Qualified Independent Contractor ("QIC") another third-party government contractor retained to independently "review the evidence and findings upon which the [previous determination was] based." 42 C.F.R. § 405.968(a)(1); 42 U.S.C. § 1395ff(c). In doing so, the QIC may receive and consider "any additional evidence the parties submit or that the QIC obtains on its own." 42 C.F.R. § 405.968(a)(1). At the *third step*, the healthcare provider may challenge the QIC's decision by requesting a hearing before an ALJ. *See* 42 U.S.C. § 1395ff(d)(1); 42 C.F.R. § 405.1000. The ALJ hearing process is administered by OMHA [*i.e.*, Office of Medicare Hearings and Appeals], a division within HHS that is independent of and funded through an appropriation separate from the division that oversees the contractors' review during the first two steps of the administrative review process. *See* Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Pub.L. No. 108–173, § 931, 117 Stat. 2066, 239699; Statement of Organization, Functions, and Delegations of Authority, 70 Fed.Reg. 36386–04 (June 23, 2005). At the *fourth step*, the healthcare provider may appeal the ALJ's decision to the Departmental Appeals Board for *de novo* review. *See* 42 U.S.C. § 1395ff(d)(2). The Departmental Appeals Board's decision becomes the final decision of the Secretary, which may then be reviewed in court. *See id*. § 1395ff(b)(1)(A); 42 C.F.R. § 405.1130.

The Medicare Act establishes deadlines for each step in the administrative review process and specifies the consequences when such deadlines are not met. The Act directs that the first two steps of administrative review be completed by the [MAC] and the QIC, respectively, within 60 days. 42 U.S.C. §§ 1395ff(a)(3)(C)(ii), 1395ff(c)(3)(C)(i). If the QIC fails to meet this deadline, the healthcare provider may bypass the QIC determination and "escalate" the process by requesting a hearing before an ALJ, even though a decision by the QIC is ordinarily a prerequisite to such a hearing. *Id.* § 1395ff(c)(3)(C)(ii). With respect to the adjudication by an ALJ, the Medicare Act provides that an ALJ "shall conduct and conclude a hearing on a decision of a [QIC] . . . and render a decision on such hearing by not later than the end of the 90–day period beginning on the date a request for hearing has been timely filed." *Id.* § 1395ff(d)(1)(A); *see also* 42 C.F.R. § 405.1016(c) (providing a 180–day deadline if the appeal had been escalated past the QIC level). If the ALJ does not render a decision before the deadline, the healthcare provider may bypass the ALJ and again escalate the process by "request[ing] a review by the Departmental Appeals Board . . ., notwithstanding any requirements for a hearing for purposes of the party's right to such a review." 42 U.S.C. § 1395ff(d)(3)(A). Finally, if the Departmental Appeals Board does not conclude its review within 90 days, *id.* § 1395ff(d)(2)(A), or within 180 days if the appeal had been escalated past the ALJ level, 42 C.F.R. § 405.1100(d), the healthcare provider "may seek judicial review [in a United States district court], notwithstanding any requirements for a hearing for purposes of the party's right to such judicial review," 42 U.S.C. § 1395ff(d)(3)(B); *see also* 42 C.F.R. § 405.1132.

In sum, in order to exhaust the administrative process for reimbursement of Medicare services, a healthcare provider must present the claim in the first instance to a Medicare Administrative Contractor and thereafter engage the process of review and appeal set forth in § 1395ff. While the statute imposes deadlines for completion at each step of the process, it also anticipates that the deadlines may not be met and thus gives the healthcare provider the option of bypassing each step and escalating the claim to the next level, ultimately reaching judicial review by a United States district court within a relatively prompt time.

816 F.3d at 53–54.

## II.    CASE HISTORY

CFVHS submitted a claim for payment of $21,375.36, Administrative Record ("AR") 652, 664, to HHS for services provided at its inpatient rehabilitation facility ("IRF") to S.T. from 9 December 2011 through 30 December 2011, AR 7. The claim was processed and paid by the Medicare Administrative Contractor ("MAC") for CFVHS's region. AR 7. Thereafter, CFVHS was notified that the claim was subject to a post-payment review from a Recovery Audit Contractor ("RAC"). AR 7. On 26 June 2013, the RAC denied coverage for the claim based upon its finding that S.T. did not require close physician supervision, AR 1346-47, and a refund request letter was sent on 10 July 2013, AR 654-59. CFVHS timely filed its appeal requesting a redetermination of the RAC's decision on 22 July 2013. AR 670. On 4 September 2013, the MAC issued a redetermination decision, upholding the denial by the RAC. AR 669-75. CFVHS requested reconsideration from the QIC, AR 45-53, and on 14 December 2013, the QIC issued a reconsideration decision, upholding the denial by the RAC, AR 679-83.

On 10 February 2014, CFVHS appealed the QIC's decision to an administrative law judge ("ALJ"), AR 693-701, but thereafter escalated its appeal to the final level of administrative appeal, the Medicare Appeals Council of the Department Appeals Board ("DAB[4]"), on 31 October 2014. AR 8, 19-29. On 7 May 2015, when no decision by the DAB had yet been

_____

[4] Though the Secretary uses the acronym "MAC" for the Medicare Appeals Council of the Department Appeals Board, the court will use the acronym "DAB" for it to avoid confusion with the Medicare Administrative Contractor.

issued, CFVHS notified the DAB that it would exercise its right to escalate its appeal to federal court.  AR 8, 16-18.  On 18 May 2015, the DAB issued its final agency decision, upholding the decision of the QIC and finding that the inpatient rehabilitation services provided to S.T. were not reasonable or necessary.  AR 3-13.  On 17 July 2015, plaintiff commenced this proceeding for judicial review, pursuant to 42 U.S.C. § 405(g).  *See* Compl. (D.E. 1).

## III.   S.T.'S COURSE OF TREATMENT

The DAB described S.T.'s condition and care as follows:

The 61-year-old beneficiary at issue was admitted to the hospital on December 5, 2011, after suffering a fall, aphasia, and right-sided weakness.  Exh. 4 at 138B[5] ("B" refers to the backside of marked page numbers).  A CT scan revealed that the beneficiary had a left parietal lobe cerebrovascular accident (CVA) [*i.e.*, a stroke] in evolution, and as a result, the beneficiary was admitted to telemetry.  *Id.* A CT scan of the spine was negative, a carotid ultrasound was unremarkable, and a 2D echocardiogram was negative for the cardiac source of embolus.  *Id.* Because the beneficiary continued to have dysphagia throughout the hospitalization, the beneficiary received a PEG [*i.e.*, percutaneous endoscopic gastrostomy] tube placement to maintain current nutritional status.  *Id.*  After the hospital course, the beneficiary was discharged to an IRF on December 9, 2011. *Id.* at 137.

The beneficiary's IRF plan of care included daily physiatric medical management, nursing care, and continued monitoring of the beneficiary's medical conditions. *Id.* at 351.[6]   The plan also included recommendations to treat right lower extremity deep venous thrombosis (DVT) with prophylaxis.  *Id.*  The beneficiary had physical therapy (PT) for bed mobility, transfers, ambulation, negotiating steps, and balance; occupational therapy (OT) for functional standing, orientation, and to follow commands; and speech therapy (ST) for swallowing and communication.  *Id.* at 88, 122B, 123.  The beneficiary's prior level of function was independent and living at home with her daughter.  *Id.* at 355-56.  At the start of the IRF care, the beneficiary required assistance for her activities of daily living (ADLs) and still had right-sided weakness with right-sided strength of 2+/5 to 3+/5.  *Id.* at 351.  After several weeks of IRF care, the beneficiary was discharged to a SNF in stable condition on December 30, 2011.  *Id.* at 337.

AR 6-7.

---

[5] The pages cited by the DAB appear to correspond to handwritten numbers appearing at the bottom of the administrative record filed with the court.  The document cited as 138B is located at AR 487.

[6] This document appears at AR 61.

## IV.    THE DAB'S DECISION

As noted, the DAB adopted the QIC's determination on plaintiff's claim for S.T.'s care, finding "that the IRF services at issue are not medically reasonable and necessary for Medicare coverage."  AR 3-4.  The DAB stated that it was applying the five requirements for IRF care to be considered medically reasonable and necessary.  AR 5.  Specifically, the DAB explained that "the documentation in the beneficiary's medical record must show a reasonable expectation that the following criteria were met at the time of admission to the IRF":

1) The patient must require the active and ongoing therapeutic intervention of multiple therapy disciplines.

2) The patient must generally require an intensive rehabilitation therapy program.

3) The patient must reasonably be expected to actively participate in, and benefit significantly from, the intensive rehabilitation therapy program.

4) The patient must require physician supervision by a rehabilitation physician.

5) The patient must require an intensive and coordinated interdisciplinary approach to providing rehabilitation.

AR 5 (citing Medicare Benefit Policy Manual ch. 1 § 110.2; 42 C.F.R. §§ 412.622(a)(3)-(5)).

The DAB concluded that the IRF services provided to S.T. were not medically reasonable and necessary, in part, because "[t]he documentation does not show that the combination of the beneficiary's medical and rehabilitation needs required the supervision of a rehabilitation physician."  AR 10.  The DAB reasoned that the records did not demonstrate "important interactions" between S.T.'s medical condition and functional goals requiring intensive supervision of a rehabilitation physician.  AR 10.  It similarly concluded that there was no specific documentation of how S.T.'s medical conditions showed the need for an intensive interdisciplinary approach.  AR 10.

The DAB also agreed with the QIC in concluding that S.T. had no new medical issues to address in IRF care. AR 11. It cited to the fact that S.T.'s CVA and a urinary tract infection she had had were addressed or resolved before her admission to IRF care, and that there were no new, acute, or complex circumstances establishing that monitoring and managing S.T.'s condition required daily hospital-level of care. AR 11. In sum, the DAB found that where rehabilitation needs are related "primarily to mobility and self-care," the patient may require only a qualified therapist and frequent involvement and medical judgment of a rehabilitation physician. AR 11. Finally, the DAB noted that S.T.'s preadmission evaluation did not include S.T.'s activity tolerance or rehabilitation potential and, accordingly, the QIC's findings supported the conclusion that S.T.'s services did not meet the requirements for IRF admission. AR 12.

## APPLICABLE LEGAL PRINCIPLES

### I.    STANDARD OF REVIEW

The standard of review for the Secretary's Medicare determination is set forth in 42 U.S.C. § 405(g). Under 42 U.S.C. § 405(g), judicial review of the final decision of the Secretary is limited to considering whether the Secretary's decision is supported by substantial evidence in the record and whether the appropriate legal standards were applied. *See Richardson v. Perales*, 402 U.S. 389, 390, 401 (1971); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence supporting factual findings is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Perales*, 402 U.S. at 401 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). It is more than a scintilla of evidence, but somewhat less than a preponderance. *Id*. Unless the court finds that the Secretary's decision is not supported by substantial evidence, the Secretary's decision must be upheld. *Smith v.*

*Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986); *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

The court may not substitute its judgment for that of the Secretary as long as the decision is supported by substantial evidence. *Hunter v. Sullivan*, 993 F.2d 31, 34 (4th Cir. 1992) (per curiam). In making its assessment, the court may not make findings of fact, revisit inconsistent evidence, or make determinations of credibility. *See Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996); *King v. Califano*, 599 F.2d 597, 599 (4th Cir. 1979). A Secretary's decision based on substantial evidence must be affirmed, even if the reviewing court would have reached a different conclusion. *Blalock*, 483 F.2d at 775. A reviewing court is limited, however, to upholding an agency action only on the basis articulated in the decision and may not consider post-hoc rationalizations offered by the agency. *See Indus. Union Dep't, AFL-CIO v. Am. Petroleum Inst.*, 448 U.S. 607, 631 n.31 (1980); *see also Prof'l Massage Training Ctr., Inc. v. Accreditation All. of Career Sch. & Colleges*, 781 F.3d 161, 174–75 (4th Cir. 2015) ("In considering whether the denial was supported by substantial evidence, we confine ourselves to the record that was considered by the accrediting agency at the time of the final decision.").

Before a court can determine whether a decision is supported by substantial evidence, it must ascertain whether the Secretary has considered all relevant evidence and sufficiently explained the weight given to probative evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997). "Judicial review of an administrative decision is impossible without an adequate explanation of that decision by the administrator." *DeLoatche v. Heckler*, 715 F.2d 148, 150 (4th Cir. 1983).

Separate from the Secretary's handling of factual matters, his decisions are governed by the Administrative Procedure Act, which requires courts to review whether the agency's decision

was "arbitrary, capricious, an abuse of discretion, . . . otherwise not in accordance with law; . . . [or] without observance of procedure required by law." 5 U.S.C. § 706(2); *Almy*, 679 F.3d at 302. The court's review under this standard is deferential "'with a presumption in favor of finding the agency action valid.'" *Almy*, 679 F.3d at 302 (quoting *Ohio Vall. Envt'l Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 192 (4th Cir. 2009)). An agency action is generally not considered arbitrary and capricious or an abuse of discretion "so long as 'the agency has examined the relevant data and provided an explanation of its decision that includes a rational connection between the facts found and the choice made.'" *Id.* (quoting *Ohio Vall. Envt'l Coal.*, 556 F.3d at 192) (internal quotations omitted); *U.S. Telecom Ass'n v. FCC*, 227 F.3d 450, 460 (D.C. Cir. 2000) (noting that under the arbitrary and capricious standard "'an agency must cogently explain why it has exercised its discretion in a given manner' and that explanation must be 'sufficient to enable [the court] to conclude that the [agency's action] was the product of reasoned decisionmaking'" (quoting *A.L. Pharma, Inc. v. Shalala*, 62 F.3d 1484, 1491 (D.C. Cir. 1995))); *Meridian Lab. Corp. v. Sebelius*, No. 3:11-CV-00406-FDW, 2012 WL 3112066, at *3 (W.D.N.C. 31 July 2012) ("Further, the 'arbitrary and capricious' standard is a 'highly deferential standard which presumes the validity of the agency's action.'" (quoting *Nat. Res. Def. Council v. EPA*, 16 F.3d 1395, 1400 (4th Cir. 1993)).

Coupled with these statutory directives are several judicial doctrines. For example, the Secretary's assessment of whether a claim is reasonable and necessary is entitled to deference from the court. *See Almy*, 679 F.3d at 302 ("[I]it is well recognized that the Secretary's interpretation of what is 'reasonable and necessary' under the Medicare Act is entitled to judicial deference . . . ."). Similarly, the Secretary's interpretation of regulations implementing the Medicare Act is also entitled to deference. *Id.* (noting that courts must "give an agency's view of

9

its own regulations 'controlling weight unless it is plainly erroneous or inconsistent with the regulation'" (quoting *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414 (1945))).

## II.    CRITERIA FOR IRF SERVICES

IRF's are facilities that provide "intensive rehabilitation therapy in a resource intensive inpatient hospital environment for patients who, due to the complexity of their nursing, medical management, and rehabilitation needs, require and can reasonably be expected to benefit from an inpatient stay and an interdisciplinary team approach to the delivery of rehabilitation care." Medicare Benefit Policy Manual ch. 1 § 110, 2006 WL 2513828, at *17, D.E. 54-1.  As noted in the DAB's decision, there are five requirements a patient must meet for care in an IRF to be deemed reasonable and necessary.    Four of these requirements are set forth in 42 C.F.R. § 412.622(a)(3), which reads:

> (3) In order for an IRF claim to be considered reasonable and necessary under section 1862(a)(1) of the [Medicare] Act, there must be a reasonable expectation that the patient meets all of the following requirements at the time of the patient's admission to the IRF—

> (i)    Requires the active and ongoing therapeutic intervention of multiple therapy disciplines (physical therapy, occupational therapy, speech-language pathology, or prosthetics/orthotics therapy), one of which must be physical or occupational therapy.

> (ii)    Generally requires and can reasonably be expected to actively participate in, and benefit from, an intensive rehabilitation therapy program.  Under current industry standards, this intensive rehabilitation therapy program generally consists of at least 3 hours of therapy (physical therapy, occupational therapy, speech-language pathology, or prosthetics/orthotics therapy) per day at least 5 days per week.  In certain well-documented cases, this intensive rehabilitation therapy program might instead consist of at least 15 hours of intensive rehabilitation therapy within a 7 consecutive day period, beginning with the date of admission to the IRF. Benefit from this intensive rehabilitation therapy program is demonstrated by measurable improvement that will be of practical value to the patient in improving the patient's functional capacity or adaptation to impairments. The required therapy treatments must begin within 36 hours from midnight of the day of admission to the IRF.

<blockquote>
(iii)    Is sufficiently stable at the time of admission to the IRF to be able to actively participate in the intensive rehabilitation therapy program that is described in paragraph (a)(3)(ii) of this section.

(iv)    Requires physician supervision by a rehabilitation physician, defined as a licensed physician with specialized training and experience in inpatient rehabilitation. The requirement for medical supervision means that the rehabilitation physician must conduct face-to-face visits with the patient at least 3 days per week throughout the patient's stay in the IRF to assess the patient both medically and functionally, as well as to modify the course of treatment as needed to maximize the patient's capacity to benefit from the rehabilitation process.
</blockquote>

42 C.F.R. § 412.622(a)(3). The required documentation relating to these requirements is specified in 42 C.F.R. § 412.622(a)(4).[7]

The fifth requirement is that the patient needs an interdisciplinary team approach to care.

It is set forth in 42 C.F.R. § 412.622(a)(5), which reads:

<blockquote>
(5) Interdisciplinary team approach to care. In order for an IRF claim to be considered reasonable and necessary under section 1862(a)(1) of the [Medicare] Act, the patient must require an interdisciplinary team approach to care, as evidenced by documentation in the patient's medical record of weekly interdisciplinary team meetings that meet all of the following requirements—

(A) The team meetings are led by a rehabilitation physician as defined in paragraph (a)(3)(iv) of this section, and further consist of a registered nurse with specialized training or experience in rehabilitation; a social worker or case manager (or both); and a licensed or certified therapist from each therapy discipline involved in treating the patient. All team members must have current knowledge of the patient's medical and functional status.

(B) The team meetings occur at least once per week throughout the duration of the patient's stay to implement appropriate treatment services; review the patient's progress toward stated rehabilitation goals; identify any problems that could impede progress towards those goals; and, where necessary, reassess previously established goals in light of impediments, revise the treatment plan in light of new goals, and monitor continued progress toward those goals.
</blockquote>

---

[7] The documentation required by this subsection is a comprehensive preadmission screening, a post-admission physician evaluation, and an individualized overall plan of care for the patient. 42 C.F.R. § 412.622 (a)(4)(i)-(iii).

(C)  The results and findings of the team meetings, and the concurrence by the rehabilitation physician with those results and findings, are retained in the patient's medical record.

42 C.F.R. § 412.622(a)(5).  As can be seen, this fifth requirement does not have the same documentation requirements as the initial four requirements.  *Id.*

## OVERVIEW OF PLAINTIFF'S CONTENTIONS

Plaintiff seeks reversal of the DAB's decision and reimbursement for S.T.'s care on the grounds that the DAB erred in (1) determining that S.T. did not require close physician supervision, (2) determining that she also did not require interdisciplinary team care, (3) relying on considerations outside of the enumerated requirements to justify its decision, and, alternatively, (4) finding plaintiff liable for any non-covered services.  Each ground is addressed in turn below followed by a discussion of the issue of remand for payment as opposed to further administrative proceedings.

## THE DAB'S DETERMINATION THAT PLAINTIFF DID NOT NEED PHYSICIAN SUPERVISION BY A REHABILITATION PHYSICIAN

Plaintiff argues that the DAB erred in concluding that S.T. did not need physician supervision by a rehabilitation physician, as required by 42 C.F.R. § 412.622(a)(3)(iv), in two ways:  first, by neglecting to consider evidence it was required to consider by regulation and, second, by failing to give any weight to the opinions of S.T.'s treating rehabilitation physician.  The court agrees with both contentions.

## I.  FAILURE TO ADDRESS INFORMATION SPECIFIED IN THE REGULATION

Plaintiff contends that the DAB improperly disregarded evidence of supervision of plaintiff by a rehabilitation physician by ignoring a provision of 42 C.F.R. § 412.622(a)(3)(iv) relating to such evidence.  The court agrees.

In its recitation of the requirement of rehabilitation physician supervision in its decision, the DAB referenced only the first sentence of 42 C.F.R. § 412.622(a)(3)(iv), which provides that a patient be required to have physician supervision by a rehabilitation physician. *See* AR 5. The DAB omitted from its decision the second sentence of this regulation. It provides: "The requirement for medical supervision means that the rehabilitation physician must conduct face-to-face visits with the patient at least 3 days per week throughout the patient's stay in the IRF to assess the patient both medically and functionally, as well as to modify the course of treatment as needed to maximize the patient's capacity to benefit from the rehabilitation process." 42 C.F.R. § 412.622(a)(3)(iv).

While never addressing the three-day-a-week requirement, the DAB did explain in its decision that "close physician involvement in the patient's care is demonstrated by documented face-to-face visits from a rehabilitation physician." AR 5. The DAB also explained the purpose of the requirement for close physician involvement:

> The purpose of these visits is to assess the beneficiary both medically and functionally (with an emphasis on the important interactions between the patient's medical and functional goals and progress) as well as to modify the course of treatment as needed to maximize the beneficiary's capacity to benefit from the rehabilitation process. The requirement for IRF physician supervision is intended to ensure that IRF patients receive more comprehensive assessments of their functional goals and progress, in light of their medical conditions, by a rehabilitation physician.

AR 5 (citing Medicare Benefit Policy Manual ch. 1 § 110.2).

In concluding that S.T. did not need the supervision required to satisfy the regulation, the DAB stated that S.T.'s medical records do "not show that there were 'important interactions' between the beneficiary's medical condition and her functional goals that would require the intensive supervision of a rehabilitation physician in an inpatient hospital environment." AR 10.

As an initial matter, as noted, the regulation expressly defines the requirement for physician supervision by a rehabilitation physician, stating in relevant part that "medical supervision means that the rehabilitation physician must conduct face-to-face visits with the patient at least 3 days per week." 42 C.F.R. § 412.622(a)(3)(iv). The regulation does not specify any other circumstances that satisfy this requirement.

Progress notes by plaintiff's rehabilitation physician, Rakesh Parikh, M.D., show that he had visits with S.T. on 12 December 2011 (AR 859), 13 December 2011 (AR 858), 14 December 2011 (AR 857), 15 December 2011 (AR 855), 16 December 2011 (AR 853), 19 December 2011 (AR 848), 20 December 2011 (AR 844), 21 December 2011 (AR 842), 23 December 2011 (AR 840), 26 December 2011 (AR 837), 28 December 2011 (AR 836), and 29 December 2011 (AR 835).[8] Under any calculation, this amounts to greater than three visits per week over the course of plaintiff's stay at the IRF from 9 December 2011 to 30 December 2011. For example, there were four visits during plaintiff's first week in the IRF (9 to 15 December 2011), three visits the next week (16 to 22 December 2011), and four visits the final week (23 to 30 December 2011). Nowhere in its decision does the DAB discuss any of these visits, or why or how they do not satisfy the rehabilitation physician supervision requirement.

To the extent that the Secretary argues that the relevant inquiry is not whether the rehabilitation physician actually visited the patient the requisite number of times during the stay, but rather, whether an expectation existed at the time of her admission to justify those visits, such an explanation is not clearly reflected in the DAB's decision.[9] *See* Def.'s Mem. (D.E. 57) 13.

---

[8] Dr. Parikh also issued a discharge summary on 29 December 2011. AR 87-88. The records further show 26 separate physician's orders (not all of which were by Dr. Parikh) modifying S.T.'s medication and insulin during her stay in the IRF. AR 111-35.

[9] Despite the Secretary's argument to that effect, the DAB's decision itself recognizes that it is not just the preadmission documents that are relevant, but the entire file. AR 5 ("Medicare contractors must consider the documentation contained in a patient's IRF medical record when determining whether an IRF admission was reasonable and necessary, specifically focusing on the preadmission screening, the post-admission physician

The DAB does not cite to any information contained in plaintiff's preadmission records that suggests that such projected visits were unnecessary. Indeed, as discussed further below, the only medical opinions in the record concerning this point state that such services were, in fact, reasonable and necessary and in S.T.'s best interest.

Equally troubling is the DAB's lack of explanation for its conclusion that there were not "important interactions" between S.T.'s medical condition and functional goals sufficient to meet the regulatory requirements for supervision by a rehabilitation physician. AR 10. Not only does this purported justification fall outside the requirements of 42 C.F.R. § 412.622(a)(3)(iv), but the DAB does not cite to a single piece of evidence that would explain this conclusion or support it. Nor is the court able to discern any such explanation or support in the records themselves.

These deficiencies alone preclude the court from determining whether the DAB's determination that plaintiff did not need physician supervision by a rehabilitation physician is supported by substantial evidence or based on proper legal standards. *See Monroe v. Colvin*, 826 F.3d 176, 189, 191 (4th Cir. 2016) (remanding a Social Security disability appeal where, among other errors, the ALJ failed to build "'an accurate and logical bridge from the evidence to his conclusion'" on the claimant's credibility (quoting *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000))). The errors are not harmless because a proper analysis could reasonably be expected to have produced a different outcome. *See*, *e.g.*, *Garner v. Astrue*, 436 F. App'x 224, 226 n.* (4th Cir. 2011) (applying *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009)); *E. Maine Med. Ctr. v. Burwell*, 159 F. Supp. 3d 109, 116 (D. Me. 2016) ("'The doctrine of harmless error is as much a part of judicial review of administrative action as of appellate review of trial court judgments.'"

---

evaluation, the overall plan of care, and the admission orders." (citing Medicare Benefit Policy Manual ch. 1 § 110.1)).

(quoting *Save Our Heritage, Inc., v. F.A.A.*, 269 F.3d 49, 61 (1st Cir. 2001))). The errors thereby

warrant denial of the Secretary's motion.

## II.     FAILURE TO ADDRESS THE OPINIONS OF DR. PARIKH

Independently, plaintiff argues that the DAB's conclusion that plaintiff did not require

close physician supervision unreasonably failed to consider or even address the opinions of Dr.

Parikh. The court agrees.

### A.     Applicable Legal Standards for Evaluation of Medical Opinions

The treating physician rule applicable in Social Security provides that if the Social

Security Administration finds that a treating source's opinion on the nature and severity of a

claimant's impairments is well supported by medically acceptable clinical and laboratory

diagnostic techniques and is not inconsistent with the other substantial evidence in the case

record, it will be given controlling weight. *See* 20 C.F.R. § 404.1527(c)(2). This treating source

rule has generally not been held uniformly applicable to cases involving Medicare claims. *See*

*Maxmed Healthcare, Inc. v. Burwell,* 152 F. Supp. 3d 619, 639 (W.D. Tex. 2016) ("There is no

presumption that a treating physician's determination is subject to any greater weight in the

Medicare context."); *cf. Keefe on Behalf of Keefe v. Shalala*, 71 F.3d 1060, 1064 (2d Cir. 1995)

("It is therefore more than possible that some version of the treating physician rule could well

apply in Medicare cases.").

Instead, most courts addressing this topic have concluded that while controlling weight

need not be given the opinions of treating physicians, such opinions are nevertheless entitled to

consideration on a Medicare determination. *See Ridgely v. Sec'y of Dept. of Health, Ed. and*

*Welfare of U.S.*, 475 F.2d 1222, 1224 (4th Cir. 1973) (holding that the Secretary's decision was

not supported by substantial evidence where little or no significance was attached to a treating

physician's opinion although there was no evidence in the record to refute it); *United Med. Healthcare, Inc. v. Dep't of Health & Human Servs.*, 889 F. Supp. 2d 832, 844 (E.D. La. 2012) ("Although the Court recognizes that a treating physician should be given considerable deference, '[a] treating physician's opinion is not dispositive' and will only be given controlling weight if it is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with . . . other substantial evidence.'" (quoting *Hosp. Serv. Dist. No. 1 of Parish of Lafourche v. Thompson*, 343 F. Supp. 2d 518, 524 (E.D. La. 2004))); *Exec. Dir. of Office of Vermont Health Access ex rel. Carey v. Sebelius*, 698 F. Supp. 2d 436, 441 (D. Vt. 2010) ("Thus, caselaw requires ALJs to give some extra weight to a treating physician's opinion, or supply a reasoned basis for declining to do so."); *Bryan v. U.S. Sec'y of Health & Human Servs.*, 758 F. Supp. 1092, 1097 (E.D.N.C. 1990) ("Where the level of care is at issue, the attending physician's opinion as to the level of care required by a patient's needs ordinarily is given great weight if there is no evidence to the contrary."); *Kuebler v. Sec'y of U.S. Dep't of Health & Human Servs.*, 579 F. Supp. 1436, 1440 (E.D.N.Y. 1984) ("While the opinion of Dr. Urist, the attending physician, is not binding on the Secretary, where there is no direct conflicting evidence his decision has great weight. . . . Failure to give the treating physician's opinion due weight and regard severely undermines the support for the Secretary's findings." (internal citations omitted)).

Similarly, a Medicare HCFA (*i.e.*, Health Care Financing Administration) Ruling[10] on this point, while not controlling, specifically indicates that the treating physician's opinion is not entitled to presumptive weight, but instead is to be "evaluated in the context of the evidence in

---

[10] HCFA Rulings are "decisions of the Administrator that serve as precedent final opinions and orders and statements of policy and interpretation . . . and provide clarification and interpretation of complex or ambiguous statutory or regulatory provisions relating to Medicare, Medicaid, Utilization and Quality Control Peer Review, and related matters." HCFA Ruling 93-1, p. 1 (18 May 1993), https://www.cms.gov/Medicare/Appeals-and-Grievances/OrgMedFFSAppeals/Downloads/HCFAR931v508.pdf (last visited 23 Feb. 2017).

the complete administrative record."  HCFA Ruling 93-1, Weight to be Given to a Treating Physician's Opinion in Determining Medicare Coverage of Inpatient care in a Hospital or Skilled Nursing Facility, 1993 WL 853211, at *1 (18 May 1993).

### B.    Dr. Parikh's Opinions

On 9 December 2011, Dr. Parikh completed rehabilitation admission orders for S.T., AR 135, examined S.T. upon her admission to the IRF, AR 60, and documented findings on that date in a History and Physical, AR 60.  He stated:

> This 61-year-old female was admitted to the services of Dr Moye on 12/05/2011 with aphasia, fall and right-sided weakness.  Her CT was significant for left parietal lobe cerebrovascular accident (CVA), which was evolving.  Her CT of the spine was negative.  Her carotid ultrasound was unremarkable.  Two-D echo was negative for cardiac source of embolus.  Because of aphasia and dysphasia, she received PEG tube placement to maintain current nutritional status.  She had a urinary tract infection.  It is now stable, and she is being transferred to Southeastern Regional Rehabilitation Center to promote functional status.

AR 60.

He noted her past medical history, which included hypertension, diabetes, hypothyroidism, status post PEG tube placement, dyslipidemia, and her having been prescribed Geodon and Cymbalta for reasons not known.  AR 60.  His plan for S.T. included:

> Inpatient rehabilitation.  This was carried out in the best interest of the patient.  Will receive daily physiatric medical management and nursing care per protocol, physical therapy b.i.d. [*i.e.*, twice a day], occupational therapy for activities of daily living, and therapeutic recreation for stress.  Speech for swallowing and communication. Basic labs.  Continued medical conditions will be monitored.  PEG feeding will be started.  Will get ultrasound of right lower extremity to rule out deep venous thrombosis (DVT).  If negative, will start patient on Lovenox for deep venous thrombosis (DVT) prophylaxis.

AR 61.  He anticipated that she would "be able to participate 3 hour a day in physical therapy, occupational therapy, speech therapy, therapeutic recreation, and psychology combined."  AR 61.

## C.     Analysis

While the court agrees with the Secretary that there is no requirement that an administrative decision maker discuss every piece of evidence, the failure to address Dr. Parikh's opinions, which relate specifically to the question of the reasonableness and necessity of S.T.'s IRF care, was improper. *See Heart 4 Heart, Inc. v. Sebelius*, No. 13-CV-03156, 2014 WL 3028684, at *7 (C.D. Ill. 3 July 2014) ("While an ALJ, and by extension the MAC, is not required to evaluate every piece of evidence in a case, the ALJ must sufficiently articulate his assessment of important evidence so the Court can 'trace the path' of the ALJ's reasoning."). The lack of any discussion in the DAB's decision of Dr. Parikh's opinions leaves the court to speculate as to precisely how it treated them and why, and precludes the court from meaningfully determining whether substantial evidence supports the DAB's decision.  The DAB's silence is particularly puzzling because it cited to other portions of the same record in its decision. *See* AR 10 (citing 351 appearing at AR 61).  Needless to say, it is not for the DAB to insert its own medical conclusions into a case in place of those of the beneficiary's physicians. *See Chater*, 98 F.3d at 970 ("ALJs must not succumb to the temptation to play doctor and make their own independent medical findings.").  The preclusion of meaningful review resulting from the DAB's failure to address Dr. Parikh's opinions is by itself fatal to the DAB's decision.

Independent of that consideration, the error was clearly harmful in that proper evaluation of Dr. Parikh's opinions could reasonably be expected to have produced a different outcome. Among other reasons, several factors tend to give potential weight to Dr. Parikh's opinion that admission to an IRF was in S.T.'s best interest.  These include, of course, his status as the rehabilitation physician who treated S.T.  He opined on the exact matters considered by the DAB in its determination of whether IRF care was reasonable and necessary for S.T.'s needs.  Thus, at

the time he rendered his opinion that IRF care was in S.T.'s best interest, Dr. Parikh was arguably the physician best equipped to evaluate S.T.'s needs from a rehabilitation perspective.

Further, there is other medical evidence, beyond Dr. Parikh's opinions, tending to substantiate S.T.'s need for IRF services. For example, in preadmission documents completed by registered nurse Jane Duckerhoff, R.N. on 7 December 2011, S.T. was reported to have weakness on her right side, and motor control with right hemiplegia/hemiparesis. AR 56-58. She was aphasic, with minimal speech and could make sounds. AR 58. R.N. Duckerhoff noted that S.T. had rehabilitation needs in physical therapy, occupational therapy, and speech language pathology, and required a rehabilitation physician, 24-hour nursing, and neuropsychology. AR 56-58. R.N. Duckerhoff also noted plaintiff's history of diabetes mellitus, hypertension, chronic back pain, hypothyroidism, anxiety, depression, and gastrointestinal reflux disease. AR 56.

Another doctor, Zane Walsh, M.D., concurred with R.N. Duckerhoff's conclusions. AR 59. Dr. Walsh signed off on a recommendation on 8 December 2011 on a form stating:

> I have reviewed this pre-admission screening document and concur with the findings. I believe the patient meets criteria, is sufficiently stable to allow participation in the program, requires an intensive level of therapy, close medical supervision, and an interdisciplinary team approach provided through an individualized plan of care. I approve admitting this patient for an intensive, inpatient rehabilitation hospital program.

AR 59.

The Secretary argues that the opinions expressed by Dr. Parikh are too conclusory to be of significant probative value. This, of course, was not a reason expressed by the DAB in its decision for rejecting them, if, in fact, it did so. In any event, the potential probative value of his opinions is evident from not only his specialization in rehabilitation and his having personally assessed plaintiff, but also the evidence discussed tending to corroborate his opinions and the absence of citation by the Secretary to contrary evidence. *Cf. United Med. Healthcare*, 889 F.

Supp. 2d at 844 (affirming Secretary's denial of IRF services where ALJ relied on evaluations of CMS's medical reviewers instead of evaluation by treating physician).

In sum, the DAB's failure to properly address the opinions of Dr. Parikh provides independent grounds for denial of the Secretary's motion.

## THE DAB'S DETERMINATION THAT PLAINTIFF DID NOT NEED AN INTERDISCIPLINARY TEAM APPROACH TO CARE

As noted, the DAB's decision also indicated that documentation in S.T.'s records did not establish how her medical conditions affected her rehabilitation goals so as to "show the need for . . . an intensive interdisciplinary approach." AR 10. The court presumes the DAB to be referencing the interdisciplinary team approach requirement in 42 C.F.R. § 412.622(a)(5). Again, this regulation requires that the need for an interdisciplinary team approach to care be "evidenced by documentation in the patient's medical record of weekly interdisciplinary team meetings" satisfying specified criteria. 42 C.F.R. § 412.622(a)(5).

Records of S.T's interdisciplinary team meetings are found in the record at AR 166-74. The records reflect team meetings on 15 December 2011 (AR 172-74), 22 December 2011 (AR 169-71), and 29 December 2011 (AR 166-68), signed off by each of the team members in attendance. The team members were Dr. Parikh,[11] a registered nurse, case manager, physical therapist, occupational therapist, speech therapist, recreational therapist, and psychologist. The DAB does not cite to those records or discuss them at all in reaching the conclusion that the need for an interdisciplinary approach was not satisfied. As before, the court is left with no explanation of the basis for the DAB's conclusions or even citation to supporting evidence in the record.

---

[11] As noted by the Secretary, Dr. Parikh does not appear to have been present at the 22 December 2011 meeting. While the box for his place as a team member was checked, his signature does not appear and the box for "present to report" is left unchecked completely. AR 171. The court does not find that this negates the import of the record or the meeting, particularly since the DAB did not assert this as a basis for its determination.

This failure, like the comparable failures previously discussed, leaves the court unable to meaningfully determine whether there is a rational connection between the facts and the conclusion reached by the DAB with respect to plaintiff's need for an interdisciplinary team approach. The error is obviously not harmless, as also with the prior comparable deficiencies. Thus, the court cannot say that the DAB's determination that S.T. did not require an interdisciplinary team approach to care is supported by substantial evidence. This failing provides an independent ground for denial of the Secretary's motion.

## RELIANCE BY THE DAB ON IMPROPER CONSIDERATIONS TO JUSTIFY ITS DECISION

In addition to the foregoing challenges to the DAB's decision, plaintiff argues that the DAB incorrectly relied on its own standards and considerations, outside of those enumerated by the regulations, to justify its decision. The court agrees.

Specifically, the DAB appears to have premised its decision at least in part on the fact that S.T. did not have new, acute medical issues to be addressed when referred to IRF care. It is not clear at all from the DAB's decision how this fact, even if deemed true, would relate to any of the five regulatory requirements for an IRF placement to be considered reasonable and necessary. To be sure, the regulations require that a patient be "sufficiently stable at the time of admission to the IRF to be able to actively participate in the intensive rehabilitation therapy program." 42 C.F.R. § 412.622(a)(3)(iii). But as this requirement indicates, a patient's status as stable would tend to substantiate that IRF care is reasonable and necessary, not the converse as the DAB appears to contend.

Similarly, to the extent that the DAB noted that S.T.'s "immediate rehabilitation needs . . . were not complex in that they were related primarily to mobility and self-care," it is not clear, even if true, how this relates to any of the enumerated requirements. The regulations

merely specify that a patient require "the active and ongoing therapeutic intervention of multiple therapy disciplines (physical therapy, occupational therapy, speech-language pathology, or prosthetics/orthotics therapy), one of which must be physical or occupational therapy." 42 C.F.R. § 412.622(a)(3)(i). Here, S.T. required physical therapy, occupational therapy, nutritional therapy, speech therapy, and special therapy to assist her with relearning to swallow. The DAB does not argue that those therapy disciplines were unnecessary for S.T.

Finally, the DAB notes that S.T.'s preadmission evaluation did not indicate her activity tolerance or rehabilitation potential. AR 12. Not only do these criteria not appear in the regulations, but the preadmission screening signed off by Dr. Walsh explicitly does identify S.T.'s rehabilitation potential as "fair." AR 59. Similarly, the history and physical completed by Dr. Parikh upon admission listed S.T.'s rehabilitation potential as "[f]air to good," noting "[g]ood strength on paretic young side and young age are positive factors." AR 61. Dr. Parikh's comments that S.T. "will be able to participate 3 hour[s] a day in physical therapy, occupational therapy, speech therapy, therapeutic recreation, and psychology combined" also arguably address S.T.'s activity tolerance. AR 61. Thus, the DAB's apparent reliance on the purported omissions from the preadmission evaluation was not only outside of the regulatory requirements, but is at least, in part, facially incorrect.

The DAB's application of improper standards was clearly erroneous. The error was not harmless; application of the proper legal standards could reasonably be expected to have produced a different outcome. This deficiency provides yet another basis for denial of the Secretary's motion.

## PLAINTIFF'S LIABILITY FOR NON-COVERED SERVICES

Lastly, in the alternative, plaintiff challenges the DAB's determination that plaintiff should be liable for non-covered services pursuant to Section 1879 of the Medicare Act. This section limits liability in cases where the provider did not know, or could not reasonably be expected to know, that the services would not be covered services. *Almy*, 679 F.3d at 299. Because, here, the court finds that substantial evidence does not support the Secretary's finding that IRF services were not medically reasonable and necessary for coverage, this alternative argument is deemed moot and need not be considered.

## REVERSAL OF THE DAB'S DECISION AND REMAND FOR REIMBURSEMENT

"Section 405(g) of the Social Security Act authorizes the Court to affirm, modify, or reverse the MAC's decision on Medicare coverage based on the record and the pleadings, with or without remanding for a rehearing. Remanding a case is unnecessary when 'all factual issues have been resolved and the record can yield but one supportable conclusion.'" *Heart 4 Heart,* 2014 WL 3028684, at *6 (C.D. Ill. 3 July 2014) (quoting *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 355 (7th Cir. 2005)); *Lodge v. Burwell*, No. 3:15-CV-390 (JBA), 2016 WL 7493954, at *8 (D. Conn. 30 Dec. 2016) ("Pursuant to 42 U.S.C. § 1395ff(b)(l)(A), which incorporates the substantive standards of 42 U.S.C. § 405(g), this Court is empowered to affirm, modify, or reverse the Secretary's final decision with or without remand.").

Because the record shows that the care provided to S.T. by plaintiff was both reasonable and necessary and no contrary evidence has been identified in the record, the determination by the Secretary should be reversed and the case remanded for the payment of reimbursement to plaintiff. *Cf. Radford v. Colvin*, 734 F.3d 288, 296 (4th Cir. 2013) (finding remand for further proceedings more appropriate than reversal "[g]iven the depth and ambivalence of the medical

record"). This relief seems particularly just here given the delay that has already occurred in this matter and the incontrovertible additional delay that would occur were the court to remand the matter for further proceedings in the Medicare appeals process. *See Breeden v. Weinberger*, 493 F.2d 1002, 1012 (4th Cir. 1974) (holding it "appropriate to reverse without remanding where the record does not contain substantial evidence to support a decision denying coverage under the correct legal standard and when reopening the record for more evidence would serve no purpose" and noting the length of time the matter had already been pending in the agency).

## CONCLUSION

For the foregoing reasons, IT IS RECOMMENDED that plaintiff's motion (D.E. 53) for judgment on the pleadings be ALLOWED, the Secretary's motion (D.E. 55) for judgment on the pleadings be DENIED, the Secretary's final decision REVERSED, and this case be REMANDED for reimbursement of plaintiff by the Secretary for the amounts previously recouped from plaintiff for the care of S.T., plus interest at the current rate published at http://www.hhs.gov/asfr/of/finpollibrary/chronorates.html.

IT IS DIRECTED that a copy of this Memorandum and Recommendation be served on each of the parties or, if represented, their counsel. Each party shall have until 9 March 2017 to file written objections to the Memorandum and Recommendation. The presiding district judge must conduct his own review (that is, make a de novo determination) of those portions of the Memorandum and Recommendation to which objection is properly made and may accept, reject, or modify the determinations in the Memorandum and Recommendation; receive further evidence; or return the matter to the magistrate judge with instructions. *See, e.g.*, 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(3); Local Civ. R. 1.1 (permitting modification of deadlines specified in local rules), 72.4(b), E.D.N.C.

If a party does not file written objections to the Memorandum and Recommendation by the foregoing deadline, the party will be giving up the right to review of the Memorandum and Recommendation by the presiding district judge as described above, and the presiding district judge may enter an order or judgment based on the Memorandum and Recommendation without such review. In addition, the party's failure to file written objections by the foregoing deadline will bar the party from appealing to the Court of Appeals from an order or judgment of the presiding district judge based on the Memorandum and Recommendation. *See Wright v. Collins*, 766 F.2d 841, 846-47 (4th Cir. 1985).

Any response to objections shall be filed within 14 days after the filing of the objections.

This 23rd day of February 2017.

James E. Gates
United States Magistrate Judge